**STATE of Minnesota, petitioner, Appellant,**

v.

**R.M.H., Respondent.**

No. C0–99–559.

Supreme Court of Minnesota.

Aug. 24, 2000.

Rehearing Denied Oct. 3, 2000.

## OPINION

### PAUL H. ANDERSON, Justice.

The issue before us is whether the State of Minnesota has jurisdiction to enforce its speeding and driver's license laws against an Indian who commits these offenses on a state highway located on the reservation of a tribe of which the Indian is not an enrolled member. The district court concluded that Minnesota does have jurisdiction over an Indian who is not an enrolled member of the tribe on whose reservation the offenses occurred. The Minnesota Court of Appeals reversed, concluding that federal law does not distinguish between tribes and reservations in granting a state jurisdiction over offenses committed on an Indian reservation. We reverse the court of appeals.

On October 29, 1998, R.M.H., then 15 years old, drove a motor vehicle on a state highway within the boundaries of the reservation of the White Earth Band of Chippewa Indians. A Becker County police officer stopped R.M.H. for driving 14 miles per hour in excess of the posted 50 mile-per-hour speed limit. After the stop, the officer gave R.M.H. a citation for violating Minn.Stat. § 169.14 (1998) (speeding) and Minn.Stat. § 171.02 (1998) (driving without a license).[1]

R.M.H. appeared in Becker County District Court on February 24, 1999, for both offenses. During that appearance, R.M.H. stipulated that he was driving 14 miles per hour in excess of the speed limit and was driving without a valid driver's license.[2] R.M.H. and the state then stipulated that R.M.H. was not an enrolled member of the White Earth Band, although his mother is a member of the band.[3] Finally, they stipulated that R.M.H. is an enrolled member of the Forest County Potawatomi Community in Crandon, Wisconsin and that the offenses occurred within the boundaries of the White Earth Reservation.

Following the district court's acceptance of this stipulation, R.M.H. moved the court to dismiss the charges against him on jurisdictional grounds. R.M.H. argued that under Pub.L. 280, 18 U.S.C. § 1162(a) (1998), and this court's decision in *State v. Stone*, 572 N.W.2d 725 (Minn.1997), Minnesota did not have jurisdiction over these traffic offenses. More specifically, R.M.H. argued that the state lacked jurisdiction because he is an Indian for the purposes of federal law, the offenses occurred in "Indian country," and the offenses were civil/regulatory. The state disagreed, arguing that neither Pub.L. 280 nor *Stone* applies here because R.M.H. is

---

1. It appears from the record that R.M.H.'s speeding offense was in the nature of a petty misdemeanor. *See* Minn.Stat. § 169.89, subd. 1 (1998).

2. R.M.H. stipulated that he committed these offenses on the White Earth Reservation, but we note that there is a discrepancy in the record about where the traffic offenses occurred. The traffic citation indicates that the offenses occurred on Minnesota Highway 224, one mile east of Ogema, Minnesota. However, the court transcript reflects that R.M.H. later stipulated that he was driving on Minnesota Highway 59. This discrepancy, however, does not affect the ultimate outcome of this case because both locations are within the boundary of the White Earth Reservation.

3. It is not clear from the record whether R.M.H. is eligible for membership in the White Earth Band by virtue of his mother being an enrolled member of the band. The issue of R.M.H.'s eligibility for membership in the White Earth Band was not raised and is not a factor in deciding the issue before the court in this case.

not an enrolled member of the White Earth Band. The district court agreed with the state, concluding that R.M.H. was subject to state jurisdiction. The court then denied R.M.H.'s motion to dismiss, found him guilty of the cited offenses, and ordered him to pay fines and surcharges totaling $167.50.

The court of appeals reversed the district court, concluding that Pub.L. 280, which grants Minnesota· jurisdiction over Indians in Indian country, does not differentiate between tribes or reservations. *See State v. R.M.H.*, 602 N.W.2d 411, 412 (Minn.App.1999). In reaching this conclusion, the court of appeals cited our decision in *Topash v. Commissioner of Revenue*, 291 N.W.2d 679, 682 (Minn.1980). More specifically, the court of appeals stated that, in *Topash*, this court "recognized, in a different context, that Public Law 280 makes no distinctions among Indians of various tribes." *R.M.H.*, 602 N.W.2d at 412 (citing *Topash*, 291 N.W.2d at 682). The court of appeals then held that, under *Stone*, the state lacked subject matter jurisdiction over R.M.H.'s traffic offenses. *See R.M.H.*, 602 N.W.2d at 413. On appeal to this court, the state challenges the court of appeals' holding that Minnesota lacked subject matter jurisdiction over R.M.H.'s offenses.

## I.

We review issues of jurisdiction de novo. *See Minnesota Ctr. for Envtl. Advocacy v. Metropolitan Council*, 587 N.W.2d 838, 842 (Minn.1999). State jurisdiction over Indians is governed by federal statutes or case law. *See Stone*, 572 N.W.2d at 728; *see also National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 855–56, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). The United States Supreme Court has approved an analytical framework for determining whether state law applies to an Indian in Indian country. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207, 210, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) ("public

policy test" superceded by Indian Gaming Regulatory Act 25 U.S.C. §§ 2701–2721 (1988) with respect to Class III gaming, *see generally United States v. E.C. Invs., Inc.*, 77 F.3d 327 (9th Cir.1996)). Under this framework, state law does not generally apply to tribal Indians on their reservation absent express consent from Congress. *See id.* at 207, 107 S.Ct. 1083. However, even absent such express consent, a state may exercise its authority if the operation of federal law does not preempt it from doing so. *See id.* at 215, 107 S.Ct. 1083.

In *State v. Stone*, we resolved an issue similar to the one we face here. 572 N.W.2d 725 (Minn.1997). Therefore, the same analytical framework that we applied in *Stone* is appropriate here. In *Stone*, the state charged enrolled members of the White Earth Band with violating state traffic laws while on their reservation and the band members contested state jurisdiction over their ·offenses. *Id.* at 728. In order to determine whether Congress had expressly consented to state jurisdiction, we first examined Pub.L. 280, which expressly grants Minnesota broad criminal and limited civil jurisdiction over specified areas of Indian country. 18 U.S.C. § 1162(a); *see also Cabazon*, 480 U.S. at 207, 107 S.Ct. 1083. We held that Pub.L. 280 did not expressly grant Minnesota jurisdiction because we determined that the charged offenses were civil/regulatory rather than criminal in nature. *See Stone*, 572 N.W.2d at 731. Recognizing that "[t]he Supreme Court has not established a per se rule prohibiting the exercise of state jurisdiction * * * in the 'absence of an express congressional grant of jurisdiction," we then addressed whether exceptional circumstances existed so that Minnesota could nonetheless exercise jurisdiction. *See id.* at 731–32. We ultimately concluded that the state lacked jurisdiction over the offenses committed by these enrolled members of the White Earth Band. *See id.*

In this case, we are presented with the question of whether the same legal principles that barred state jurisdiction in *Stone* apply where the offender is an Indian, but is not an enrolled member of the governing tribe. Here, as in *Stone*, we first must look to Pub.L. 280 to determine whether Congress has expressly consented to Minnesota's jurisdiction over R.M.H.'s traffic offenses. In the absence of such express consent, we then would have to determine whether federal law preempts state jurisdiction.

Public Law 280 grants Minnesota jurisdiction over offenses "committed by or against Indians in the areas of Indian country" within Minnesota, except on the Red Lake Indian Reservation. 18 U.S.C. § 1162(a).[4] This grant of jurisdiction was intended to combat the problem of lawlessness on reservations and a lack of tribal law enforcement. *See Bryan v. Itasca County*, 426 U.S. 373, 379, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). The Supreme Court defined the parameters of Pub.L. 280 in *Cabazon* when it held that Pub.L. 280 grants states "broad criminal jurisdiction over offenses committed by or against Indians within all Indian country within the State." *Cabazon*, 480 U.S. at 207, 107 S.Ct. 1083. The Court then approved the Ninth Circuit's conclusion that a state statute is "criminal/prohibitory," and therefore within Pub.L. 280's grant of jurisdiction, if the statute is generally intended to prohibit certain conduct. *Id.* at 209, 107 S.Ct. 1083 (citing *Barona Group of Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir.1982)). Conversely, the Court held that a statute does not fall within Pub.L. 280's grant of jurisdiction if it generally permits the conduct at issue, subject to regulation. *See Cabazon*, 480

U.S. at 209, 107 S.Ct. 1083. In the latter case, the statute is properly classified as "civil/regulatory" and Pub.L. 280 does not expressly grant the state jurisdiction to enforce the statute on an Indian reservation. *Cabazon*, 480 U.S. at 209, 107 S.Ct. 1083 (quoting *Barona*, 694 F.2d at 1185).

We specifically addressed Pub.L. 280's scope with respect to certain traffic laws in *Stone*, 572 N.W.2d at 725. There, we characterized the laws at issue, which included driving without a valid driver's license and speeding, as civil/regulatory. *See id.* at 728, 731. Accordingly, we concluded that, under Pub.L. 280, Minnesota did not have authority to enforce its civil/regulatory traffic laws that occurred on the White Earth Reservation against enrolled members of the White Earth Band. *See Stone*, 572 N.W.2d at 732. Further, we concluded that exceptional circumstances did not exist to warrant state jurisdiction over a tribal member absent an express federal grant. *See id.* Therefore, we held that the state lacked jurisdiction over the offenses. *See id.*

Citing *Stone*, R.M.H. argues that Minnesota does not have jurisdiction over his traffic offenses because they are civil/regulatory. The state argues that R.M.H.'s offenses do not fit within the ambit of Pub.L. 280. Rather than focusing on the nature of R.M.H.'s offenses, the state argues that Pub.L. 280 does not apply to R.M.H. because he is not an "Indian" for the purposes of federal law. Consequently, while R.M.H. and the state focus on different aspects of Pub.L. 280, they both argue that this federal statute does not expressly grant Minnesota jurisdiction over R.M.H.'s offenses. We agree

4. Public Law 280, 18 U.S.C. § 1162(a) states: (a) Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

\* \* \* \*

Minnesota ............All Indian country within the State, except the Red Lake Reservation.

with this conclusion, which is consistent with our decision in *Stone*. Therefore, we hold that R.M.H.'s driving without a license and speeding offenses are civil/regulatory and do not fit within Pub.L. 280's express grant of jurisdiction to Minnesota.[5] *See Stone*, 572 N.W.2d at 731. Because we reach this result under our holding in *Stone*, it is not necessary for us to address the state's argument that R.M.H. is not an "Indian" for the purposes of Pub.L. 280.

## II.

■ Having concluded that Pub.L. 280 does not grant Minnesota jurisdiction over R.M.H.'s traffic offenses, we turn to the next part of our analysis. Here, as in *Stone*, we must consider whether, absent express consent, Minnesota nonetheless may exercise its jurisdiction over R.M.H.'s offenses. As previously noted, a state may exercise jurisdiction on a tribal reservation absent express federal consent if the operation of federal law does not preempt it from doing so. *See Cabazon*, 480 U.S. at 215, 107 S.Ct. 1083. Therefore, we must consider whether federal law preempts Minnesota from exercising jurisdiction over R.M.H.'s traffic offenses which were committed on a state highway located on the White Earth Reservation.

■ A state may be preempted by federal law from exercising jurisdiction over activity undertaken on a reservation or by tribal members. *See id.* at 216, 107 S.Ct. 1083. "State jurisdiction is preempted * * * if it interferes or is incompatible with federal and tribal interests re-

flected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983). Although Indian tribes still possess "attributes of sovereignty over both their members and their territory[,]" *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (superceded by Indian Civil Rights Act 25 U.S.C. §§ 1301–03 (1983 & Supp.1998) as to inherent power of Indian tribes to exercise criminal jurisdiction over all Indians, *see United States v. Weaselhead*, 156 F.3d 818, 823 (8th Cir.1998)) (quoting *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975)), this right of tribal self-government is ultimately subject to the broad power of Congress. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

The Supreme Court stated in *Cabazon* that " 'under certain circumstances a State may validly assert authority over the activities of nonmembers on a reservation, and ... in exceptional circumstances, a State may assert jurisdiction over the on-reservation activities of tribal members.' " 408 U.S. at 215, 92 S.Ct. 2308 (quoting *Mescalero*, 462 U.S. at 331–32, 103 S.Ct. 2378). In *Stone*, we held that such "exceptional circumstances" were not present when Minnesota sought to exercise its jurisdiction over civil/regulatory traffic offenses committed on a tribal reservation by enrolled members of the governing tribe. *See Stone*, 572 N.W.2d at 732. Because a

---

**5.** The dissent mischaracterizes our conclusion that Pub.L. 280 does not expressly grant Minnesota jurisdiction over R.M.H.'s offenses when it states that "the majority * * * implicitly, if not explicitly, holds that Pub.L. 280, as Congress's express grant of jurisdiction to the states over criminal offenses, *is* federal law that *does* preempt the state from asserting jurisdiction." Based on this mischaracterization, the dissent then concludes that a preemption analysis is unnecessary. As noted earlier, Pub.L. 280 expressly grants Minnesota broad criminal and limited civil jurisdic-

tion over specified areas of Indian country. 18 U.S.C. § 1162(a). The dissent fails to recognize the marked difference between an express grant and an express prohibition. While Pub.L. 280 does not expressly grant Minnesota jurisdiction over R.M.H.'s offenses, it does not expressly prohibit such jurisdiction. Therefore, as in *Stone*, we must proceed with a preemption analysis. Thus, by focusing only on Pub.L. 280, the dissent falls short in its analysis of the underlying principles of tribal sovereignty as they apply to this case.

state's jurisdictional relationship to a person on a tribal reservation varies depending on whether that person is an enrolled member of the tribe, we must first ascertain R.M.H.'s status in relation to the White Earth Band by examining relevant federal authority.[6]

At this point, it is important to reiterate that it is undisputed that R.M.H. is not an enrolled member of the White Earth Band. Although R.M.H. may be eligible for membership with the White Earth Band because his mother is an enrolled member, this is not an issue here. R.M.H. stipulated that at the time of the offenses he was not an enrolled member of the White Earth Band. Therefore, for the purposes of our review, R.M.H. is a nonmember Indian; that is to say, he is an Indian who is not an enrolled member of the governing tribe—the White Earth Band—on whose reservation his traffic offenses occurred.[7]

Tribal sovereignty is "dependent on, and subordinate to, only the Federal Government, not the States." *Cabazon*, 480 U.S. at 207, 107 S.Ct. 1083 (quoting *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 154, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)). Therefore, in order to ascertain the scope of tribal sovereignty in a given situation, federal case law controls. *See National Farmers*, 471 U.S. at 855–56, 105 S.Ct. 2447. This conclusion mandates that we look to a series of Supreme Court cases under which the Court has provided a framework for understanding and applying the concept of Indian sovereignty as it relates to nonmember Indians. *See Duro v. Reina*, 495 U.S. 676, 684–85, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990) (stating that *Oliphant v. Suquam-ish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), and *Wheeler*, 435 U.S. at 313, 98 S.Ct. 1079, as well as subsequent cases provide the analytic framework for resolution of the issue of whether sovereignty retained by tribes in their independent status within our scheme of government includes the power of criminal jurisdiction over nonmembers). Analysis of these cases reveals that Indian sovereignty is at its strongest in the context of self-governance, that is, authority over members of the governing tribe. In contrast, the strength of Indian sovereignty is less with respect to authority over nonmembers of the governing tribe, including nonmember Indians.

In *Oliphant*, the Supreme Court discussed the general nature of Indian sovereignty in the context of determining whether Indian tribal courts have criminal jurisdiction over non-Indians. 435 U.S. 191, 206, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). The Court described Indian tribes as being "quasi-sovereign" by virtue of their incorporation into the United States. *See id.* at 208–09, 98 S.Ct. 1011 (citing *Cherokee Nation v. Georgia*, 5 Pet. 1, 15, 8 L.Ed. 25 (1831)). The Court later described this retained sovereignty as that needed to control and to preserve a tribe's own internal relations, customs, and social order. *See Duro*, 495 U.S. at 685–86, 110 S.Ct. 2053. As a result of this limitation on tribal sovereignty, the Court reasoned that Indian tribes do not retain the power to try non-Indian citizens of the United States, except to the extent allowed by Congress. *See id.* at 211, 110 S.Ct. 2053.

The Supreme Court next interpreted and applied its reasoning and holding in *Oliphant* in *Wheeler*, 435 U.S. at 313, 98

---

6. The dissent erroneously concludes that it is only proper to analyze the distinction between member and nonmember Indians in the context of Pub.L. 280. However, in this case, *Cabazon* and *Stone* dictate that this distinction be analyzed in the broader context of preemption.

7. At the onset of our discussion of the nature of Indian sovereignty, we note that the Supreme Court has not consistently utilized the same nomenclature when addressing this issue. As a result, some of the Court's decisions have not clearly differentiated between nonmember Indians, non-Indians, and Indians.

S.Ct. 1079. The Court stated in *Wheeler* that Indian sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance." *Id.* at 323, 98 S.Ct. 1079. Therefore, Indian tribes only "possess those aspects · of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *Id.* In *Wheeler,* the Court further explained that limitations on jurisdiction

> rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. *They involve only the relations among members of a tribe.* Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status.

*Id.* at 326, 98 S.Ct. 1079 (emphasis added).

The Court subsequently applied *Oliphant* in the context of nonmember Indians when it addressed whether a tribe could prohibit hunting and fishing by nonmembers of the tribe on reservation land owned by non-Indians. *See Montana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). In *Montana,* the Court stated that· "[t]hough *Oliphant* only determined inherent tribal authority in criminal matters, the principles on. which it relied support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana,* 450 U.S. at 565, 101 S.Ct. 1245 (footnote omitted). The Court therefore concluded that a tribe also retained au-

thority over conduct of non-Indians if that conduct threatens or directly affects the political integrity, economic security, or health or welfare of the tribe. *See id.* at 566, 101 S.Ct. 1245 (citing *Fisher v. District Court,* 424 U.S. 382, 386, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976)). Because such interests were not implicated under the facts before it in *Montana,* the Court held that the tribe did not have jurisdiction to regulate hunting or fishing on reservation land owned by nonmembers of the tribe. *See id.* at 566–67, 101 S.Ct. 1245.

The Supreme Court again addressed Indian tribal jurisdiction when it considered whether the State of Washington could tax purchases on a reservation by Indians who are not members of the governing tribe. *See Colville,* 447 U.S. at 152, 100 S.Ct. 2069.[8] The Court concluded that the mere fact that a nonmember of the governing tribe comes within the definition of an Indian does not exempt that Indian from state taxing jurisdiction. *See id.* at 161, 100 S.Ct. 2069. The Court said:

> Federal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt 'Washington's power to impose its taxes on Indians not members of the Tribe. * * * [T]he mere fact that nonmembers resident on the reservation come within the definition of "Indian" for purposes of the Indian Reorganization Act of 1934, * * * does not demonstrate a congressional intent to exempt such Indians from state taxation.
>
> Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. *For most practical purposes*

---

**8.** The dissent questions the propriety of our use of *Colville* to "compare the interests of ·competing sovereignties," implying that distinguishing between member and nonmember Indians for state taxing purposes does not involve considerations similar to those involved in state jurisdiction over traffic enforcement. In response to this contention,

we refer to *Duro* where the Supreme Court considered whether an Indian tribe may assert criminal jurisdiction over a nonmember Indian and used its analysis in *Colville* of the distinction between member and nonmember Indians in relation to self-government as support for its holding. 495 U.S. at 686–87, 690, 110 S.Ct. 2053.

*those Indians stand on the same footing as non-Indians resident on the reservation.*

*Id.* at 160–61, 100 S.Ct. 2069 (emphasis added). The Court concluded that "[f]ederal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt [a state's] power to impose its taxes on Indians not members of the Tribe." *Id.* at 160, 100 S.Ct. 2069. Accordingly, the Court held that the state's interest in taxing nonmember Indians' purchases outweighed any tribal interest. *See id.*

The Supreme Court in *Oliphant* and its progeny framed Indian jurisdiction over other Indians in terms of a tribe's retained power of self-governance over its own tribal members. *See, e.g., Montana,* 450 U.S. at 565, 101 S.Ct. 1245; *Colville,* 447 U.S. at 161, 100 S.Ct. 2069. Conversely, the Court has held that by nature of its dependent status, a tribe does not retain inherent sovereign powers over nonmembers of the tribe. *See Montana,* 450 U.S. at 565, 101 S.Ct. 1245. The court has stated that "[T]ribes are not mere fungible groups of homogenous persons among whom any Indian would feel at home." *Duro,* 495 U.S. at 695, 110 S.Ct. 2053. Further, the Court stated in *Colville* that nonmember Indians who reside on a tribal reservation are, for practical purposes, the same as non-Indians. 447 U.S. at 161, 100 S.Ct. 2069.

▮▮▮▮ We therefore conclude that, when comparing federal and state interests to determine whether federal law preempts Minnesota's jurisdiction over R.M.H., regulation of nonmember Indians warrants different consideration than does regulation of member Indians. More specifically, R.M.H., as a nonmember Indian, is not entitled to the same insulation from state government authority on the White Earth Reservation as are enrolled members of the White Earth Band because the White Earth Band's sovereign interest is not as strongly implicated as it would be with an enrolled member. Further, because R.M.H. is a nonmember Indian,

Minnesota is less likely to be preempted from exercising its authority over his traffic offenses than over the same offenses committed by an enrolled member of the White Earth Band. *See Cabazon,* 480 U.S. at 214–15, 107 S.Ct. 1083; *see also, e.g., Wheeler,* 435 U.S. at 323, 98 S.Ct. 1079 ("Indian tribes still possess those aspects of sovereignty not withdrawn * * * by implication as a necessary result of their dependent status.").

Our analysis rests heavily on the status of R.M.H. as a nonmember Indian. R.M.H. sought to overcome this distinction by relying on our decision in *Topash v. Commissioner of Revenue,* 291 N.W.2d 679 (Minn.1980). More specifically, R.M.H. asserts that because he is a member of a federally recognized tribe—the Forest County Potawatomi Community—he is an Indian who is entitled to the same insulation from state government authority as a member of the White Earth Band. Essentially, he argues that he is an "Indian" for the purposes of federal law because under our decision in *Topash,* the term "Indian" does not distinguish between tribes. 291 N.W.2d at 682. We now note, however, that the precedential value of this part of our decision in *Topash* has been negated by the line of Supreme Court decisions beginning with *Oliphant.*

In *Topash,* we considered whether Minnesota had authority to collect income tax from a nonmember Indian who was living and working on the Red Lake Indian Reservation. *Id.* at 680. In reaching our decision, we looked to Pub.L. 280 as a point of reference and noted that it refers to "Indians" without distinguishing between tribes and was intended to "protect Indians, of whatever tribe, from state government interference * * *." *Topash,* 291 N.W.2d at 682–83. We then held that federal Indian jurisdiction includes all Indians regardless of their membership status and therefore preempts state jurisdiction to tax a nonmember Indian. *See id.*

Our conclusion in *Topash* that Indian jurisdiction includes Indians of all tribes conflicts with how the Supreme Court has defined Indian sovereignty in *Oliphant* and its progeny, which cases lead to a distinction between nonmember Indians and Indians who are members of the tribe on whose reservation they reside. Our reasoning in *Topash* is specifically refuted by the Supreme Court's decision in *Colville*, where the Court reached the opposite result. *See Colville*, 447 U.S. at 161, 100 S.Ct. 2069. Because Supreme Court cases conflict with part of our decision in *Topash*, we conclude that *Topash* is no longer controlling on this issue.

We next proceed to compare federal and state interests to determine whether state law conflicts with federal interests so that federal law preempts Minnesota's jurisdiction over R.M.H.'s traffic offenses. When we do so, we must continue to bear in mind our earlier conclusion that, as a nonmember Indian, R.M.H. is not entitled to the same insulation from state government authority on the White Earth Reservation as are enrolled members of the White Earth Band.

▮▮▮▮ Because of the unique nature of tribal sovereignty, our inquiry into whether federal law preempts state law "is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but [calls] for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in [this] specific context, the exercise of state authority would violate federal law." *Bracker*, 448 U.S. at 145, 100 S.Ct. 2578. Further, in this area of the law, a preemption analysis rests "principally on a consideration of the nature of the competing interests at stake" and rejects "a narrow focus on congressional intent to preempt state law as the sole touchstone." *Mescalero*, 462 U.S. at 334, 103 S.Ct. 2378.

The Supreme Court has stated that the goals of tribal self-government, self-sufficiency, and economic development are

overriding goals. *Cabazon*, 480 U.S. at 216, 107 S.Ct. 1083; *see also Mescalero*, 462 U.S. at 344, 103 S.Ct. 2378. These goals reflect an interest in protecting a tribe's retained sovereignty over its members and its territory. *See Bracker*, 448 U.S. at 142, 100 S.Ct. 2578. Accordingly, the Court has emphasized that "there is a significant geographical component to tribal sovereignty" and has "consistently guarded the authority of Indian governments over their reservations." *Id.* at 151, 100 S.Ct. 2578 (quotations omitted). The Court also has held that state law may be preempted if it relates to an area that is so pervasively regulated by the federal government that state regulation would obstruct federal policies. *See id.* at 148, 100 S.Ct. 2578. Therefore, we must focus on the specific factual context in which this case comes before us and then weigh the competing interests at stake. Here, we are presented with a nonmember of the White Earth Band who committed civil/regulatory traffic offenses on a state-operated and maintained highway located within the boundaries of the White Earth Reservation.

Using these specific facts, we first determine whether state jurisdiction over R.M.H. threatens the federal interest in encouraging tribal self-government. Supreme Court cases suggest that tribal interest in self-governance is limited to relations between a tribe and its own members, not all Indians generally. *See, e.g., Duro*, 495 U.S. at 695, 110 S.Ct. 2053; *Colville*, 447 U.S. at 160–61, 100 S.Ct. 2069; *Oliphant*, 435 U.S. at 211, 98 S.Ct. 1011. Further, state jurisdiction does not significantly affect a tribe's retained sovereignty over its territory because this federal interest is significantly diminished where, as here, the state exercises jurisdiction over a person who is not a member of the tribe. *See, e.g., Colville*, 447 U.S. at 161, 100 S.Ct. 2069 (concluding that imposition of state sales and cigarette taxes on Indians not members of the tribe does not "contravene

the principle of self-government, for the simple reason that nonmembers are not constituents of the governing Tribe."). For these reasons, we conclude that granting Minnesota jurisdiction over R.M.H.'s traffic offenses does not threaten the federal interest in encouraging tribal self-government.

Next, we determine whether state jurisdiction threatens the economic development and self-sufficiency of the White Earth Band. In *Colville*, although the Supreme Court acknowledged that a tribe has the authority to tax transactions occurring on its lands that affect its members, it concluded that such authority does not oust a state from any power to tax on-reservation cigarette purchases by a person not a member of the tribe. 447 U.S. at 152, 155, 100 S.Ct. 2069. Accordingly, the Court held that federal law does not preempt a state's sales and cigarette taxes on on-reservation purchases by nonmembers of the tribe. *See id.* at 155–62, 100 S.Ct. 2069. The White Earth Band's economic interest in regulating traffic offenses against nonmembers of the tribe is minimal compared to a tribe's economic interest in taxing on-reservation purchases. Therefore, like the Court in *Colville*, we conclude that state jurisdiction over R.M.H.'s offenses does not unduly impinge on the White Earth Band's economic development and self-sufficiency.

Finally, we determine whether state jurisdiction over R.M.H.'s offenses relates to an area pervasively regulated by federal law. We conclude that it does not. The federal government has not imposed a detailed scheme of traffic regulations on tribal reservations and has demonstrated little interest in enforcement of traffic laws on state-operated and maintained highways. Here, there is no federal regulatory scheme so pervasive as to preclude state jurisdiction.

Juxtaposed with what we conclude is a diminished federal interest in tribal self-government, self-sufficiency, and economic development is Minnesota's strong interest in regulating the safe flow of traffic on its state-operated and maintained highways. Minnesota's interests, when compared with the federal interests, are more than sufficient to justify state jurisdiction over civil/regulatory traffic offenses committed on a state highway on an Indian reservation by an Indian who is not an enrolled member of the governing tribe. *See, e.g., Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 443–44, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) ("In no field has this [federal] deference to state regulation been greater than that of highway safety regulation."). Accordingly, we conclude that the federal interest in tribal self-government, self-sufficiency, and economic development is not contravened by state authority over R.M.H.'s traffic offenses. Therefore, we hold that the court of appeals erred when it held that Minnesota did not have jurisdiction over R.M.H.'s traffic offenses.

Reversed and remanded for further proceedings consistent with this opinion.

STRINGER, Justice (dissenting).

I respectfully dissent. Our guiding rule of law is the broad principle that the state does not have jurisdiction over the conduct and affairs of Indians while in Indian country in the absence of a specific grant of Congressional authority to the states to act in derogation of the principles of tribal sovereignty, *see California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 215, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), or where state interests are sufficient to justify the exercise of state authority. *See New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983).

Public Law 280 confers to Minnesota, and a few other states, jurisdiction to punish offenses committed by Indians in Indian country. *See* Pub.L. 280, 18 U.S.C. § 1162(a) (1998). In *Cabazon* however, the Supreme Court limited the grant of jurisdiction under Pub.L. 280 to criminal offenses and excluded from state jurisdic-

tion the regulation of conduct that was civil in nature. *See* 480 U.S. at 209, 107 S.Ct. 1083. We applied this formulation in *State v. Stone* where we held that nine different motor vehicle violations were civil/regulatory in nature, including proof of insurance and driving without a license, because they do not pertain to fundamental issues of traffic safety on highways such as driving while intoxicated or reckless driving. 572 N.W.2d 725, 731 (Minn.1997). As civil/regulatory offenses they could not be the subject of state enforcement. *See id.*

The theory of the state is simply that because R.M.H. is not a member of the White Earth Tribe he should be subject to jurisdiction of the state highway regulations, and is premised on the grant of jurisdiction under Public Law 280. But Pub.L. 280 makes no distinction between member and non-member Indians: "[The state] shall have jurisdiction over offenses committed by or against Indians in * * * Indian country." Pub.L. 280, 18 U.S.C. § 1162(a); *see also Topash v. Commissioner of Revenue,* 291 N.W.2d 679, 682 (Minn.1980) ("Pub.L. 280 * * * refer[s] to "Indians" without distinguishing between tribes. The broad general policy is to protect Indians, of whatever tribe, from state government interference.") (citations omitted) (footnote omitted).[1] When the majority agrees with the state and holds that Pub.L. 280 does not grant the state jurisdiction over R.M.H. it implicitly, if not explicitly, holds that Pub.L. 280, as Con-

gress's express grant of jurisdiction to the states over criminal offenses, *is* federal law that *does* preempt the state from asserting jurisdiction. In light of the Court's mandate that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit," *Montana v. Blackfeet Tribe,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985), and because Pub.L. 280 unambiguously fails to distinguish between member and non-member Indians, state jurisdiction over R.M.H. is plainly lacking. The holding of the majority regarding the applicability of Pub.L. 280 thus ends the discussion of preemption.[2]

Even if it were appropriate to go on to compare the interests of competing sovereignties, I would reach the same result. The majority relies on *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), a case concerning state authority to collect state taxes from nonmember Indians making purchases on an Indian reservation. The majority puts heavy emphasis on the *Colville* Court distinguishing between member and nonmember Indians for state taxing purposes, and concludes that "nonmember Indians warrant different considerations than do member Indians" for purposes of state jurisdiction over traffic enforcement. This is a five foot leap over a ten foot ditch however, as the majority provides no reasoning as to why state interests in taxing

---

1. The majority inappropriately relies on *Duro v. Reina,* 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990), *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) and *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) where the Supreme Court established a framework for determining the parameters of tribal jurisdiction over crimes committed by non-member Indians. In *Duro* however the Supreme Court drew a distinction between tribal authority over non-member Indians, not an issue here, and the broad grant of federal jurisdiction with respect to "Indians as a single large class," as Pub.L. 280 provides. *Duro,* 495 U.S. at 689–90, 110 S.Ct. 2053.

2. In *Cabazon* the Supreme Court concluded that Pub.L. 280 did not grant the state jurisdiction to regulate gambling on Indian reservations but went on to a preemption analysis. However, there the Court was determining whether the state had jurisdiction over gambling through a legal basis other than Pub.L. 280. Here there is no question, in light of *State v. Stone,* 572 N.W.2d at 731, that the state does not have jurisdiction over minor traffic offenses committed by Indians on reservations. Now to ignore the plain language of Pub.L. 280 by holding that it does not apply to non-member Indians undermines not only Pub.L. 280 but also *Stone.*

purchases on reservations are similar to, bear on, or have anything to do with the state's interest in regulating traffic offenses–and the Supreme Court has in fact ruled that a state's interest in tax cases is unique. *See, e.g., Cabazon,* 480 U.S. at 215, n. 17, 107 S.Ct. 1083 (noting that the area of state taxation of Indian tribes is a "special area" in which the Court has adopted a *"per se* rule"); *see also Mescalero v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) (making reference to "the special area of state taxation"). The federal government obviously has no interest in local traffic enforcement, and the question becomes whether the state's interest in traffic enforcement should be greater than that of the White Earth Band. I do not believe that it is our prerogative to determine that it is, as the interest of both is strong, and tribal governments have the additional interest of retaining sovereignty over the people and conduct on their reservation as well as recognizing the rights of members of all Indian nations. *See, e.g., Mescalero,* 462 U.S. at 334–335, 103 S.Ct. 2378.

Congress and the Supreme Court have given states a clear directive in Pub.L. 280 and *Cabazon* that shapes and defines state jurisdiction over certain Indian activities on Indian reservations. An attempt to carve out broader jurisdiction than has been granted to the states is inconsistent with the Supreme Court's mandate that tribal sovereignty is "dependent on, and subordinate to, only the Federal Government, not the States." *Cabazon,* 480 U.S. at 207, 107 S.Ct. 1083 (quotation omitted). The rule of the majority undermines this carefully crafted conferral of limited state jurisdiction as applied in *Cabazon* and challenges well-established principles of Indian autonomy and self-government. *See* 480 U.S. at 207, 107 S.Ct. 1083 ("Indian tribes retain attributes of sovereignty over both their members and their territory") (quotation omitted). It overlooks "traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal'

of encouraging tribal self-sufficiency * * *[,]" *Cabazon,* 480 U.S. at 216, 107 S.Ct. 1083 (quoting *Mescalero,* 462 U.S. at 334–335, 103 S.Ct. 2378). Finally, by ignoring the guidance provided by Congress and the Supreme Court regarding Pub.L. 280, we as a court ignore the long established and well respected dual federal and state court structure where both institutions ideally embody in their opinions "sensitivity to the legitimate interests of both State and National Governments." *Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

PAGE, Justice (dissenting).

I join in the dissent of Justice STRINGER.

RUSSELL A. ANDERSON, Justice (dissenting).

I join in the dissent of Justice STRINGER.