STATE of Minnesota, Petitioner, Appellant,

v.

Myron Joseph BUSSE, Jr., Respondent.

No. C1–00–481.

Supreme Court of Minnesota.

May 16, 2002.

Mike Hatch, Minnesota Atty. Gen., Robert A. Stanich, Asst. Atty. Gen., Kip O. Fontaine, Clearwater County Atty., Jeanine Renee Brand, Clearwater Asst. County Atty., for appellant.

Kevin Miller, Zenas Baer, Hawley, for respondent.

Shirley Cain, Tribal Atty., for amicus curiae, White Earth Band of Ojibwe.

Joseph Plumer, Tribal Atty., Michael Garbow, Associate Tribal Atty., for amicus curiae, Leech Lake Band of Ojibwe.

Dennis J. Peterson, Tribal Atty., for amicus curiae, Fond du Lac Band of Ojibwe.

## OPINION

ANDERSON, Paul H., Justice.

On December 15, 1999, Myron Joseph Busse, Jr. was charged with a gross misdemeanor for driving on a Clearwater County road after cancellation of his Minnesota driver's license as inimical to public safety under Minn.Stat. § 171.24, subd. 5 (1998).[1] Busse's driver's license had been canceled on January 1, 1998. His driving record reflects that the cancellation resulted from four separate driving under the influence convictions. *See* Minn.Stat. § 171.04, subd. 1(9) (1998).[2] The first incident occurred in April 1990, the second in October 1993, and the last two in January and October of 1997. Busse stipulated to the fact that his license had been canceled as inimical to public safety and that he had been driving a car on a public road. Busse asserted that the charged offense is civil/regulatory, not criminal/prohibitory, and moved to dismiss the charge on the grounds that the state did not have subject matter jurisdiction. Busse's basis for his motion was that he is an enrolled member of the White Earth Band of Chippewa

---

1. Minnesota Statutes § 171.24, subd. 5, was changed in 1999 only to reflect the numbering changes made in Minn.Stat. § 171.04 (1998), in which the inimical to public safety provision was renumbered from Minn.Stat. § 171.04, subd. 1(9), to Minn.Stat. § 171.04, subd. 1(10) (2000). Act of May 25, 1999, ch. 238, art. 2 § 91, 1999 Minn. Laws 1820, 1880.

2. The cancellation or denial as inimical to public safety clause of Minn.Stat. § 171.04 was renumbered from subdivision 1(9) to subdivision 1(10) after Busse's arrest in this case. Act of May 25, 1999, ch. 238, art. 2, § 23, 1999 Minn. Laws 1820, 1849–50.

Indians and that he was driving on the White Earth Reservation at the time of the violation.

The district court denied Busse's motion, concluding that the charge was "enforceable" because the state had jurisdiction. Busse pleaded guilty and was sentenced, but his sentence was deferred pending an appeal to the Minnesota Court of Appeals. The court of appeals reversed the district court and dismissed the charge, concluding that the state did not have jurisdiction to enforce the charge against Busse because he is an Indian, the offense was civil/regulatory, and the offense occurred on the reservation. We reverse.

On the morning of December 14, 1999, a Clearwater County Sheriff's Deputy observed respondent Myron Joseph Busse, Jr. driving a car on Clearwater County Road Number 7—a road maintained by the county and open to the general public, but within the boundaries of the White Earth Indian Reservation. The deputy believed that Busse's driving privileges had been canceled as inimical to public safety, so he called the dispatcher to verify this belief. The dispatcher confirmed that Busse's driver's license and privileges had been canceled as inimical to public safety. The state asserts that because the deputy was involved in other official business, he did not stop Busse at that time.

Later that same day, the deputy observed Busse traveling as a passenger in a car on another county road. The deputy stopped the car and asked Busse why he had been driving a car that morning. Busse responded, "I was just driving my buddies around." Busse was then charged with a gross misdemeanor for driving after cancellation as inimical to public safety in violation of Minn.Stat. § 171.24, subd. 5.

Busse's driving record reflects that before this arrest he had numerous driving under the influence violations. On April 3, 1990, Busse was stopped by the police and consented to an alcohol test. His license was then revoked when the test revealed that his blood alcohol level was above the legal limit. On October 1, 1993 and again on January 29, 1997, Busse was stopped by the police. On both of these occasions, he refused an alcohol test, his license was revoked, and he eventually pleaded guilty to driving under the influence. On October 25, 1997, Busse was stopped for a fourth time, but on this occasion he consented to an alcohol test. He then pleaded guilty to driving under the influence. On January 1, 1998, Busse's license was canceled as inimical to public safety under Minn.Stat. § 171.04, subd. 1(9), because of his four driving under the influence convictions. Busse's driving record also reflects that before his arrest in this case, he had been stopped twice for driving after his license was canceled as inimical to public safety, although no disposition was given for these stops.

 In the present case, the parties first stipulated to the facts and then Busse moved to dismiss the gross misdemeanor charge against him. Busse argued that the state did not have subject matter jurisdiction to enforce driving after cancellation because he was an enrolled tribal member, the offense was civil/regulatory, and he had been driving on his reservation at the time of the offense. The state asserted that it had jurisdiction to enforce driving after cancellation as inimical to public safety. The state argued that Busse's charge was different from the driving after revocation charge at issue in *State v. Johnson* which we held to be civil/regulatory and thus not enforceable on the Indian reservation. 598 N.W.2d 680 (Minn.1999). The district court denied Busse's motion, concluding that the state did have jurisdiction to enforce driving after cancellation as inimical to public safety, based on the court

of appeals' decision in *State v. Zornes*, 584 N.W.2d 7 (Minn.App.1998). In *Zornes*, the court of appeals held that driving after cancellation as inimical to public safety was a criminal/prohibitory offense which, under our court's precedent, allowed the state to enforce it on an Indian reservation. *Id.* at 11. Following this ruling, Busse pleaded guilty, but preserved his right to appeal the jurisdictional issue.[3] The court convicted Busse of the offense and sentenced him to 1 year in jail, with all but 10 days stayed, and a $3,000 fine, with all but $750 stayed, and 2 years unsupervised probation on the condition that Busse not drive without a valid license and insurance. The court then postponed the execution of the sentence pending Busse's jurisdictional appeal.

On appeal, the court of appeals concluded that *Zornes* was overruled by our opinion in *Johnson*, 598 N.W.2d 680. *State v. Busse*, 616 N.W.2d 760, 763–64 (Minn.App. 2000). The court of appeals read *Johnson* to suggest that consideration of the offense that triggered the cancellation was inappropriate, and therefore driving after cancellation as inimical to public safety was no different than driving after revocation based on failure to show proof of insurance in *Johnson*. *Busse*, 616 N.W.2d at 763–64. The court of appeals then reversed the district court because it concluded the cancellation to be civil/regulatory and directed that the charge against Busse be dismissed. *Id.* at 763–64. The state appeals, arguing that driving after cancellation as inimical to public safety is criminal/prohibitory. It asserts that the offense here is different from the revocation charge at issue in *Johnson* because driving after can-

cellation as inimical to public safety is one of the state's mechanisms to enforce driving under the influence violations and therefore raises heightened public policy concerns.

## I.

■ Whether the state has jurisdiction to enforce its laws with respect to an Indian charged with an offense committed on his reservation is an issue that we review de novo without considering the decisions of the lower courts. *State v. R.M.H.*, 617 N.W.2d 55, 58 (Minn.2000). We explained the history and process for determining whether the state has jurisdiction in *R.M.H.*, beginning with the premise that the state's authority to exercise subject matter jurisdiction over Indians is governed by federal law. *Id.*

[S]tate law does not generally apply to tribal Indians on their reservations absent express consent from Congress. However, even absent such express consent, a state may exercise its authority if the operation of federal law does not preempt it from doing so. * * * [T]he same analytical framework that we applied in *Stone* is appropriate here. * * * In order to determine whether Congress had expressly consented to state jurisdiction, we first examined Pub.L. 280, which expressly grants Minnesota broad criminal and limited civil jurisdiction over specified areas of Indian country. * * * This grant of jurisdiction was intended to combat the problem of lawlessness on reservations and a lack of tribal law enforcement. * * * Pub.L. 280 grants states broad

---

**3.** It appears that the parties and the court thought they were following the correct procedure for preserving appellate review of pretrial issues. However, a correct procedure would have required Busse to plead *not guilty,* but stipulate to the state's case. *State*

*v. Lothenbach*, 296 N.W.2d 854, 857 (Minn. 1980). On appeal, the state correctly pointed out that Busse did not waive his jurisdictional claim by pleading guilty because a guilty plea by a counseled defendant operates to waive only nonjurisdictional defects. *Id.*

criminal jurisdiction over offenses committed by or against Indians within all Indian country within the State. * * * [A] state statute is "criminal/prohibitory," and therefore within Pub.L. 280's grant of jurisdiction, if the statute is generally intended to prohibit certain conduct. * * * [A] statute does not fall within Pub.L. 280's grant of jurisdiction if it generally permits the conduct at issue, subject to regulation. In the latter case, the statute is properly classified as "civil/regulatory" and Pub.L. 280 does not expressly grant the state jurisdiction to enforce the statute on an Indian reservation.

*Id.*, at 58–59 (referring to *State v. Stone,* 572 N.W.2d 725 (Minn.1997)) (internal quotations and citations removed). Here, we must look to whether the law at issue is civil/regulatory or criminal/prohibitory to determine whether Congress expressly consented to Minnesota's jurisdiction over Busse. *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *R.M.H.,* 617 N.W.2d at 58–59.

In *Stone,* we adopted a two-step analysis to determine whether a law was civil/regulatory or criminal/prohibitory under *Cabazon. Stone,* 572 N.W.2d at 730 (analyzing *Cabazon,* 480 U.S. at 210–11, 107 S.Ct. 1083). The first step is to determine whether to analyze the broad conduct—driving—or the narrow conduct—driving after cancellation as inimical to public safety. *Id.* at 730. We will focus on the broad conduct unless "the narrow conduct presents substantially different or heightened public policy concerns," in which case we will focus on the narrow conduct. *Id.* Once the proper focus is determined, the second step in the *Cabazon/Stone* test is to determine if the conduct at issue is gener-

ally permitted but subject to regulation, or if it is generally prohibited. *Id.* Conduct generally permitted subject to regulation is civil/regulatory and conduct generally prohibited is criminal/prohibitory. *Id.*

■ Under *Cabazon,* "[t]he applicable state laws governing an activity must be examined in detail before they can be categorized as regulatory or prohibitory." 480 U.S. at 211 n. 10, 107 S.Ct. 1083. Thus, we first examine Busse's offense to determine whether the conduct at issue presents substantially different or heightened public policy concerns compared to the broad conduct of driving. Busse was convicted of driving after cancellation as inimical to public safety. Minnesota statutes provide that the Commissioner of Public Safety shall not issue a license to or may cancel the license of any person who is not eligible or would be denied a license, including persons for whom "the commissioner has good cause to believe that the operation of a motor vehicle on the highways by the person would be inimical to public safety or welfare." Minn.Stat. §§ 171.04, subd. 1(9), 171.14 (1998). Therefore, the offense at issue reflects a determination that Busse's driving is inimical to public safety, and we must inquire into what that determination means.

The legislature by statute and the commissioner by rule have expounded on the inimical to public safety standard. The legislature has provided that the commissioner shall revoke the license and deny or cancel a license as inimical to public safety of a person who has either (a) three driving under the influence convictions in five years or (b) four or more convictions in a lifetime. Minn.Stat. §§ 169.121, subd. 4(4) and (5), 171.04, subd. 1(9), 171.14 (1998).[4]

4. The legislature reworked the driving under the influence statutes in 2000 and as part of

the statutory changes, Minn.Stat. § 169.121, subd. 4(4) and (5), was repealed and these

By rule there are only three circumstances under which licenses are canceled. Minn. R. 7503.1300. All three relate to multiple alcohol or controlled substance violations and the commissioner is not allowed any discretion in the cancellation or denial. *Id.* Thus, cancellation as inimical to public safety necessarily requires multiple driving under the influence convictions.

The court of appeals and the dissents read *Johnson* to suggest it is improper to look at an underlying offense that led to a license revocation. *Busse,* 616 N.W.2d at 763–64. This construction is erroneous, however, because in *Johnson* we did not hold that a court could not look at the basis for a license revocation. Using decidedly tentative language, we simply raised the question whether the issue *might* arise *whether* fairness precludes considering the underlying offense because the offender *could* be subject to being sanctioned twice for the prior offense. *Johnson,* 598 N.W.2d at 684.

More importantly, in *Stone* we addressed the appropriate level of our inquiry in the context of whether we should focus on the specific conduct prohibited by the statute or the broad conduct of driving. In doing so, we cautioned against adopting a rigid framework that attempts to characterize all driving-related statutes as either civil or criminal. Specifically, we stated:

> provisions are now found, with some changes, in the Driving While Impaired statutes— Minn. Stat. § 169A.54, subd. 1(4) and (5) (2000). Act of May 15, 2000, ch. 478, art. 1, § 34, 2000 Minn. Laws 1484, 1510–11.

5. We note that in a number of other contexts, Minnesota law directs courts to look to an underlying or previous offense when making decisions on a current offense. *E.g.,* Minn. Stat. § 152.021, subd. 3(b) (2000) (increasing penalties for controlled substance crimes based on prior convictions for controlled substance crimes); Minnesota Sentencing Guidelines II.C. (stating that the presumptive sentences under the Minnesota Sentencing Guidelines are based on the current crime and the criminal history of the defendant); Minn.Stat. § 609.175, subd. 2 (2000) (stating that the penalties for conspiracy are determined by looking to the severity of the underlying crime); Minn.Stat. § 609.185(5) and (6) (2000) (making child abuse murder and domestic abuse murder first-degree murders based on a past pattern of abuse by the defendant against the victim).

If the broad conduct of driving is analyzed without any consideration of the nature of the specific traffic statutes, then virtually any traffic or driving-related statute would be considered civil, despite serious public policy concerns the specific statute may raise. Conversely, if each traffic statute is analyzed individually to determine if the narrow conduct is generally prohibited or permitted, practically every discrete aspect of a traffic law could be classified as criminal for the purposes of Public Law 280.

572 N.W.2d at 729–30. We then concluded that, "Fortunately, *Cabazon* does not require this court to adopt either of these approaches." *Id.* at 730. Thus, looking at the underlying basis for a license revocation or, in this case, cancellation, is not prohibited when determining whether the offense involves heightened public policy concerns.[5]

Accordingly, our focus remains on whether the specific offense reflects heightened public policy concerns. In *Stone,* we outlined several factors that might be used to determine whether an activity violates the state's admitted public policy related to driving "in a nature serious enough to be considered 'criminal.'" 572 N.W.2d at 730. Those nonexclusive factors include:

> (1) the extent to which the activity directly threatens physical harm to per-

sons or property or invades the rights of others; (2) the extent to which the law allows for exceptions and exemptions; (3) the blameworthiness of the actor; (4) the nature and severity of the potential penalties for a violation of the law.

*Id.*

As noted above, cancellation as inimical to public safety necessarily requires multiple driving under the influence convictions. Further, we start with the recognition that the public policy underlying laws combating driving under the influence "is substantially heightened in comparison to the general scheme of driving laws, in that their violation creates a greater risk of direct injury to persons and property on the roadways." *Stone,* 572 N.W.2d at 731. Moreover, the offense of driving after cancellation as inimical to public safety implicates the necessarily greater concern regarding a person who has repeatedly (by statute, at least three times) violated Minnesota's driving under the influence laws, and yet continues to drive. The legislature and the commissioner have determined that such persons pose a continuing hazard to public safety on Minnesota roads and should have their driving privileges revoked or canceled. Minn.Stat. § 169.121, subd. 4(4) and (5); Minn. R. 7503.1300.

The legislature has determined that persons who continue to drive under these circumstances deserve a criminal sanction. *See Stone,* 572 N.W.2d at 730 (including nature and severity of potential penalties for violation of the law in consideration of whether activity violates criminal public policy). Driving after cancellation as inimical to public safety is a gross misdemeanor, punishable by up to one year in jail, or a $3,000 fine, or both. Minn.Stat. §§ 171.24, subd. 5, 609.03(2) (1998). In contrast, driving after suspension, revocation, disqualification, and cancellation for reasons other than as inimical to public safety are misdemeanor offenses.[6] Minn. Stat. § 171.24. The relative severity of the penalty for driving after cancellation as inimical to public safety compared to the sanctions for driving after other license denials, while not determinative of the outcome, underscores the heightened public policy concerns associated with the sanctioned conduct.

The United States Supreme Court cautioned in *Cabazon* that a criminal penalty alone does not make a civil/regulatory law criminal/prohibitory and we do not exclusively rely on the criminal penalty here. 480 U.S. 202, 211, 107 S.Ct. 1083, 94 L.Ed.2d 244. Instead, we follow *Stone's* direction to also consider the extent to which the activity directly threatens physical harm. 572 N.W.2d at 730. Busse asserts that his driving cannot pose heightened public policy concerns because he was not intoxicated while driving. However, Busse's license was canceled because the commissioner determined that *any* driving of a motor vehicle on a public road by Busse was inimical[7] to public safety. Minn.Stat. § 171.04, subd. 1(9). Busse would only be labeled as inimical to public safety under the statute if he had demonstrated at least three incidents in which he

---

6. When making this comparison, we do not suggest that crimes that are misdemeanors cannot reflect heightened public policy concerns. For example, in *Stone* we stated that driving while intoxicated, a misdemeanor, reflects heightened public policy. Minn.Stat. § 169.121, subd. 1(a), 3(b) (1998); *Stone,* 572 N.W.2d at 731.

7. "Inimical" is defined as "[a]dverse or injurious in tendency or influence; harmful, hurtful." *Oxford English Dictionary* 1438 (1971). "Inimical" is also defined as "injurious or harmful in effect; adverse." *The American Heritage Dictionary of the English Language* 929 (3d ed. 1992) Thus, by definition, the conduct at issue threatens physical harm.

consumed sufficient alcohol or drugs to put him over the legal limit, drove, and was caught.[8] Given this history, we can conclude that his driving poses a risk to public safety and implicates heightened public policy concerns.[9]

Busse's gross misdemeanor offense is but one piece of a larger fabric of laws aimed at increasing the severity of punishment against those persons who, due to their alcohol and drug use, pose a particularly severe threat to the safety of others.[10] *See generally*, Minn.Stat. §§ 169.121–.129 (1998). The only persons subject to cancellation under this statutory scheme are those for whom the punishment stemming from a second driving under the influence conviction has failed to change behavior, resulting in a third conviction for driving under the influence.[11] This pattern of behavior signals both a significant alcohol or drug problem and a defiance of the laws of our state and, thus, a significant risk to public safety. The ability of Minnesota to protect its citizens would be severely compromised if the state is not allowed to enforce cancellation of driving privileges, one of the most important remedies, in terms of public safety, for driving while intoxicated.[12]

8. In his dissent, Justice Stringer criticizes our review of Busse's DWI record. Review of Busse's record is necessary to establish a basis to understand the offense of driving after cancellation or denial as inimical to public safety in much the same way a description of the prior felony conviction is necessary to establish a basis to understand the offense of a felon in possession of a firearm. By depicting our review of the record as being "tantalizing to snare the unwary," the dissent uses dramatic language in an effort to keep from the reader essential information about Busse's offense. If successful, the dissent would have us build a barrier around this information such that an uninformed reader may be snared into ignoring the serious or pervasive nature of the underlying conduct, giving rise to the cancellation of the license. That being said, we agree with the dissent that the sole charge against Busse is driving after cancellation as inimical to public safety.

9. Contrary to Justice Russell Anderson's assertion in his dissent, we do not need to assume that any person whose license has been canceled as inimical to public safety poses a severe public safety risk because of drug or alcohol abuse. Under the present state of the law, the *only* circumstances in which a person can have his license canceled as inimical to public safety involves repeated drug or alcohol abuse while driving. Accordingly, it is not *our* assumption that these persons present a heightened danger to public safety—it is the assumption of the Commissioner of Public Safety, acting under authority delegated by the legislature. Here, we are not presented with a situation in which it is even possible for a license to be canceled as inimical to public safety for some reason other than repeated driving under the influence convictions. As in *Johnson*, we leave the door open to situations in which the reason underlying the cancellation presents different concerns than are before us in this case.

10. In 2001, the legislature made Busse's gross misdemeanor offense a felony under which an offender may be sentenced to imprisonment for not more than seven years, or to payment of a fine of not more than $14,000, or both. Act of June 30, 2001, Ch. 9, Art. 19, § 4, 2001 Minn. Laws 2696.

11. Persons found to be inimical to public safety who do not currently have a license are also denied the privilege of even obtaining one. In his dissent, Justice Page incorrectly concludes that the effect of the majority opinion is to create separate classifications for similarly-situated persons. This is not so. There is but one class of similarly situated persons—persons to whom the privilege to drive is denied. A person may gain this status in either of two ways. If the person never had or currently does not have a license, he or she cannot obtain a license; if the person already has a license, his or her license is canceled and he or she cannot obtain another license. If either such person drives, he or she can be prosecuted under the statute.

12. The determination as to the type and method of sanction which most effectively prevents driving under the influence is a legislative

The existence of a particularly severe threat to safety as reflected in the status as canceled as inimical to public safety distinguishes this case from *Johnson* and *Stone*. Of the offenses at issue in *Stone*, those relating to insurance coverage were held to be civil/regulatory because they were closely related to the *general* public policy (i.e., not heightened public policy) of promoting the physical safety of drivers on the roadways. 572 N.W.2d at 731. Likewise, the revocation in *Johnson* was based on failure to provide proof of insurance, and it followed from *Stone* that driving after revocation on that basis was also civil/regulatory.[13] In contrast, driving after cancellation as inimical to public safety is a criminal offense that is inextricably linked to multiple driving under the influence convictions and the state's efforts to halt further driving by those who disregard the state's driving under the influence laws. As noted above, we stated unequivocally in *Stone* that drinking and driving laws involve substantially heightened public policy because violation of the laws creates a greater risk of direct injury to persons and property. 572 N.W.2d at 731.

Therefore, it is not only the fact of revocation, suspension, cancellation, or other administrative action with respect to a license that is significant for purposes of determining heightened public policy. Rather, we look for offenses that constitute "serious breaches in the social fabric which threaten grave harm to persons or property." *Stone*, 572 N.W.2d at 730. That is to say, in another case a revocation—rather than, as in this case, a cancellation—based on prior alcohol-related offenses may also reflect heightened public policy concerns and merit the criminal/prohibitory label. Finally, heightened public policy concerns are also demonstrated by the absence of exceptions and exemptions from the law making it a crime to drive after driving privileges have been canceled as inimical to public safety. *See* Minn. Stat. § 171.24, subd. 5; *Stone*, 572 N.W.2d at 730 (including consideration of whether exceptions and exemptions from the law exist in determining whether law reflects criminal public policy). There are no such exemptions.[14]

In sum, the criminal sanction imposed, the direct threat to physical harm, the need for the state to be able to enforce cancellations based on a threat to public safety, and the absence of exceptions to the offense of driving after cancellation based on being inimical to public safety all

---

determination. We therefore reject Justice Russell Anderson's suggestion in his dissent that the legislature must bundle all of its criminal/prohibitory laws into one offense, rather than cancel the license and punish separately driving after cancellation.

**13.** In his dissent, Justice Stringer states that our opinion represents a departure from the "clear legal principles established" in *Stone* and *Johnson*. By making this statement, the dissent asserts that the aforementioned cases dictate the result to be reached here. This is not so. *Stone* and *Johnson* were narrowly written so that different cases with different facts being applied to different statutes could be separately analyzed and decided on their respective merits. As shown by our analysis, driving after cancellation or denial as inimical to public safety is an offense different from the offenses dealt with in *Stone* and *Johnson*. The "clear legal principles" the dissent asserts that it has gleaned from its reading of *Stone* and *Johnson* are at best an overly broad reading of the holdings in those cases.

**14.** There is only one exception to driving after cancellation as inimical to public safety and that is part of a pilot program and only for drivers who are halfway through a rehabilitation program and agree to drive only vehicles equipped with an alcohol sensing ignition interlock device. Minn.Stat. § 171.305 (1998). Of course, this exception applies only to the underlying cancellation and not to the offense of driving after cancellation.

demonstrate heightened public policy concerns. Therefore, we conclude that the offense of driving after cancellation as inimical to public safety presents substantially different or heightened public policy concerns.

Having concluded under the first step of the *Cabazon/Stone* test that Busse's offense presents heightened public policy concerns, we must, under the second step of the test, focus on the narrow conduct of driving after cancellation as inimical to public safety. We must determine whether this conduct is generally permitted or generally prohibited. *Stone*, 572 N.W.2d at 730. Driving after cancellation or denial as inimical to public safety is strictly prohibited conduct within the borders of the state of Minnesota. Minn.Stat. § 171.24, subd. 5. Unlike driving in general, driving after cancellation or denial is not generally allowed. *Id.* Once a person's license is canceled or denied on these grounds, driving is prohibited and exceptions for limited licenses are not allowed. Minn.Stat. § 171.24; Minn.Stat. § 171.30, subd. 3 (1998); Minn. R. 7503.1800, subps. 1, 2.[15] Thus, the conduct at issue, driving after cancellation as inimical to public safety, is generally prohibited conduct and under our *Cabazon/Stone* analysis the offense is criminal/prohibitory.

Because we conclude that Minn.Stat. § 171.24, subd. 5, is criminal/prohibitory, Minnesota courts have jurisdiction to enforce the statute against a tribal member who commits this offense on his Indian reservation. Therefore, we hold that Minnesota courts have subject matter jurisdiction to enforce the charge of driving after cancellation as inimical to public safe-

ty against Busse even though he is an enrolled tribal member of the White Earth Reservation and committed this offense on that reservation.

II.

■ Busse asserts for the first time in his brief to our court that the state failed to prove all the elements of the charge against him because he was not required to have a license to drive on the reservation, and thus, cannot violate Minn.Stat. § 171.24, subd. 5. However, by pleading guilty and stipulating to the prosecution's case, including that he was driving a car, Busse waived any challenge on this point. *Lothenbach*, 296 N.W.2d at 857. Additionally, because we conclude that the offense of driving after cancellation as inimical to public safety is criminal/prohibitory and that the state has jurisdiction to enforce it against Busse while on his reservation, Busse's argument that the charge can never apply to him on the reservation is without merit.

Justice Russell Anderson states in his dissent that our position on this issue is "particularly harsh" because Busse only mistakenly pleaded guilty. However, as the dissent acknowledges, the *Lothenbach* plea procedure is one used "for submitting a case to the court for decision while reserving *pretrial* issues for appeal." (Emphasis added.) We have not considered the use of a *Lothenbach* plea as a means for obtaining an appellate sufficiency of the evidence review. Thus, even if we were to conclude that Busse should be treated as though he correctly used the *Lothenbach* procedure, he still would not

---

15. When making the point that there are no exceptions for limited licenses for persons convicted of driving after cancellation or denial as inimical to public safety, we do not suggest that if a limited license may be granted after conviction for a particular crime, that offense may not be criminal/prohibitory. Rather, we only make the point here that there are no exceptions for a limited license to amplify our conclusion that Busse's conduct is generally prohibited.

have preserved his claim that the state had not proved all of the elements of the crime charged because, as we have developed the *Lothenbach* procedure thus far, it is for obtaining appellate review of pretrial decisions. *Lothenbach*, 296 N.W.2d at 857. If Busse wanted to challenge the state's proof of the elements of the charge, he should have proceeded to trial and argued to a factfinder that the state had not proven all the elements of the charge instead of stipulating to the state's case.[16]

### III.

■ Busse also raised an equal protection challenge for the first time in his brief to this court. Our general rule is that we will not decide issues that were not raised before the district court. *State v. Sorenson*, 441 N.W.2d 455, 457 (Minn.1989). We may in our discretion, however, decide an issue if "the interests of justice require their consideration and addressing them would not work an unfair surprise on a party." *Id.* Busse has not presented any reason why we should consider his constitutional claim for the first time on appeal. Therefore, we conclude that Busse has waived consideration of his equal protection claim.

Reversed and remanded.

ANDERSON, Russell A., Justice (dissenting).

### I.

I respectfully dissent and join in the separate dissents of Justice Page and Justice Stringer. The majority departs from the path the court chose just two years ago in *State v. Johnson*, 598 N.W.2d 680, 684 (Minn.1999), to not examine the reasons behind a licensure decision in determining whether a licensure violation is criminal/prohibitory or civil/regulatory. We took that course in part because in *State v. Stone*, we made clear that the policies behind licensure laws were not substantially different or heightened from the general policy behind the driving laws. 572 N.W.2d 725, 730–31 (Minn.1997). Our decisions in *Stone* and *Johnson* compel me to conclude that the state does not have jurisdiction over the offense of driving after cancellation as inimical to public safety.

In *Stone*, we stated without qualification that the requirement that one possess a valid driver's license is imposed by a civil/regulatory and not criminal/prohibitory statute. 572 N.W.2d at 731. In *Johnson*, we held that a charge of driving after revocation, there based on failure to produce proof of insurance, was a civil/regulatory offense and consequently not within the state's jurisdiction to enforce on a reservation. 598 N.W.2d at 684. Moreover, we addressed in *Johnson* the question presented in this case, whether to look beyond the revocation or cancellation of a license to the underlying reason for the licensure action to determine whether the offense is civil/regulatory or criminal/prohibitory. We stated in *Johnson*:

> A fundamental difference between the offense of driving after revocation and other traffic offenses is that driving af-

---

**16.** The conclusion reached on this issue by Justice Russell Anderson in his dissent could have dramatic ramifications. The dissent's use of the *Lothenbach* procedure expands its usage significantly beyond the use for review of pretrial decisions. The dissent forgives Busse's error of pleading guilty despite the fact that the *Lothenbach* procedure has been in place for 20 years. The dissent also ignores the fact that Busse did not raise this claim with the district court or the court of appeals. Finally, the dissent expands the *Lothenbach* review to accommodate a sufficiency of the evidence review. Each of these actions by the dissent has the possibility of establishing new rules for how we review errors on appeal, despite the fact that this issue was not briefed or argued by the parties.

ter revocation is a subsequent violation committed only after a driver's license has been revoked because of a prior offense. *See* Minn.Stat. § 171.24, subd. 2. Obviously the prior offense carries its own sanction based upon the severity of the conduct. As each offense is triggered by different and unrelated conduct, the issue might then arise whether fairness should dictate that the nature of the subsequent offense, for purposes of the *Stone* analysis, not be measured by the nature of the prior offense, because if it were the offender could be subject to being sanctioned twice for the prior offense. Further, it is significant here that in *Stone* we held that driving without a valid license does not raise policy concerns substantially different from the general policy of public safety and therefore the violation is civil/regulatory. *We would hardly be consistent to now conclude that even though a tribal member is not required to have a driver's license at all while driving on a tribal reservation, driving after revocation of a license should be an offense that rises to the level of a "heightened public policy" concern.*

598 N.W.2d at 684 (emphasis added) (citing *Stone*, 572 N.W.2d at 730). The majority engages in the inconsistency we rejected so recently in *Johnson* by holding that driving after cancellation, based on the underlying offenses, is criminal/prohibitory.

The majority attempts to distance its holding from *Johnson* on the basis that the language used in *Johnson* was tentative. After the language that the majority now labels as tentative, however, we stated unequivocally that driving without a valid license does not raise policy concerns substantially different from the general policy behind the driving laws. *Johnson*, 598 N.W.2d at 684 (citing *Stone*, 572 N.W.2d at 730). The majority dismisses *Johnson*, but our consideration of the public policy behind licensure laws in *Johnson* follows directly from *Stone*, where we had previously held that policies behind the requirement of a valid license were not substantially different or heightened from the general policy behind the driving laws. *Stone*, 572 N.W.2d at 730–31. As such, we are bound by that precedent to hold that driving after cancellation is civil/regulatory.

Moreover, if inquiring into the basis for a cancellation is proper, can we not also consider that cancellation itself remains wholly administrative, suggesting regulation rather than prohibition? The majority notes that the Department of Public Safety rules provide only circumstances relating to alcohol or controlled substance violations as bases for cancellation as inimical to public safety. *See* Minn. R. 7503.1300. The commissioner promulgates these rules as part of the commissioner's regulatory authority, however, and could conceivably include wholly regulatory offenses such as speeding (*see Stone*, 572 N.W.2d at 730) as a basis for cancellation of a driver's license as inimical to public safety. The majority merely *assumes* that one whose license has been cancelled as inimical to public safety has a severe drug or alcohol problem posing a public safety risk, however, as demonstrated by the facts in this case, the offense of driving after cancellation may involve absolutely no actual threat to safety.[1] State jurisdiction over the conduct of Indians on reser-

---

1. Of course, if Busse had been intoxicated while driving, the state could have charged him with an appropriate criminal offense, which provides a disincentive to drink and drive and calls into question the majority's additional assumption that enforcement of driving after cancellation on Indian reservations is necessary for the state to enforce its drinking and driving laws.

vations cannot rest on what is only speculation regarding those who drive after their license has been cancelled.

The majority also claims that the status of driving after cancellation as a gross misdemeanor strongly suggests heightened public policy concerns. The U.S. Supreme Court in *Cabazon* made clear, however, that the mere presence of a criminal penalty will not make a civil/regulatory law criminal/prohibitory. *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 211, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).

The majority also finds support for its conclusion of heightened public policy concerns in use of the term "inimical" to describe the basis for the cancellation. Public policy behind the broad conduct of driving is the protection and safety of persons and property on the roadways. *Stone,* 572 N.W.2d at 730–31. Driving after cancellation as "injurious or harmful" to public safety (the definition of "inimical" referred to in the majority opinion) indicates no more heightened policy than "safety of persons and property on the roadways." Indeed, drivers who may be actually inimical to public safety for reasons other than repeat driving under the influence violations are not allowed licenses, *see, e.g.,* Minn.Stat. § 171.04, subd. 1(11) (persons unable to read official signs), and their driving despite the absence of licensure would not be considered a criminal/prohibitory offense. *See Stone,* 572 N.W.2d at 730.

The majority claims the court's ruling is consistent with *Stone.* To be clear, we said in *Stone,* "[e]xamples of traffic laws which *might* raise substantially different or heightened public policy concerns include Minn.Stat. § 169.121 (*prohibiting drinking and driving*)." 572 N.W.2d at 731 (emphasis added). The majority chooses to ignore this tentative language. In any

event, we did not in *Stone* label every aspect of section 169.121, which includes such diverse topics as mandatory driver education instruction, as criminal/prohibitory. Nor did we in *Stone* label every administrative consequence of drinking and driving to be a criminal/prohibitory law. The referenced phrase addresses only laws prohibiting drinking and driving, which the law at issue in this case does not do.

Finally, the majority claims that the ability of the state to enforce its criminal laws against persons who repeatedly drive under the influence is undermined if the license can be cancelled but the state cannot enforce the cancellation by imposing criminal penalties for driving after cancellation. However, the legislature has the authority to enact criminal laws involving repeat drunk driving offenses unrelated to licensure. Indeed, as the majority notes, there is now a felony level drunk driving offense reaching just this type of conduct. *See* Minn.Stat. § 169A.24 (Supp.2001) (prohibiting as a felony driving while impaired within ten years of the first of three or more qualified prior impaired driving incidents).

The logical progression of the majority's analysis leads to the conclusion that laws regulating speed limits must be considered criminal/prohibitory because to do otherwise would impair the state's ability to enforce its criminal laws against careless and reckless driving. However, in *Stone* we held that speed limits did not raise heightened public policy concerns and careless and reckless driving did raise those concerns. 572 N.W.2d at 730–31. If it is the policy of the state that repeated DWI is a crime warranting more severe penalties, the legislature can so provide within the context of the criminal laws, rather than through administrative laws relating to licensure.

Our decisions in *Stone* and *Johnson* and the option for the state to enforce drinking and driving laws through criminal prohibition rather than regulatory licensure indicate that driving after cancellation poses no substantially different or heightened public policy concerns than the public policy behind driving. *See Stone*, 572 N.W.2d at 730. I would hold that our decision in *Johnson* prohibits us from considering predicate offenses when determining whether the focus of the test should be on the broad or narrow conduct in applying the *Cabazon* test. I would also hold that an offense related to licensure, including driving after cancellation as inimical to public safety is civil/regulatory in nature and therefore outside the state's jurisdiction.

## II.

The charge against Busse should be dismissed in any event because the state must but cannot prove each element of the charge against him. *State v. Jones*, 347 N.W.2d 796, 800 (Minn.1984). The majority contends that Busse waived any challenge to require the state to prove every element of the charge when he pled guilty. Busse attempted to use the procedure outlined in *State v. Lothenbach*, 296 N.W.2d 854 (Minn.1980) for submitting a case to the court for decision while reserving pretrial issues for appeal. *Lothenbach* procedures require a plea of not guilty, but despite the parties' and trial court's intent to follow *Lothenbach* in this case, Busse pled guilty, an erroneous plea by all accounts. Given the expectation shared by all that they intended to follow the *Lothenbach* procedures, I would not hold that Busse's erroneous guilty plea waived his right to challenge whether the state proved its case. *See State v. Verschelde*, 595 N.W.2d 192, 195 (Minn.1999).

The majority also holds that by stipulating to the prosecution's case, including that he was driving a car, Busse waived this challenge to the conviction. The state must prove more than that Busse drove a car, however. The state must prove as an element of the offense that operation of the motor vehicle required a driver's license. Minn.Stat. § 171.24, subd. 5. The question presented by this element of the offense is related to the question addressed by the court in this appeal, however, and it is therefore particularly harsh to conclude that Busse waived the issue of whether his operation of the vehicle required a driver's license.

The majority disposition thereby avoids the tough question of how, in the absence of a waiver of trial, the jury would have been instructed on this offense. A jury must be instructed on each element of an offense, *LaMere v. State* 278 N.W.2d 552, 557 (Minn.1979), and that unless the state proves each element, they must acquit, *see State v. Larson*, 281 N.W.2d 481, 485, 485 n. 2 (Minn.1979). Given that it is undisputed that a driver's license is not required to drive on a reservation, *Stone*, 572 N.W.2d at 731, there is a serious question whether the state could prove that operation of the motor vehicle required a driver's license, an element of Minn.Stat. § 171.24, subd. 5.

When Busse attempted to use the *Lothenbach* procedure, everyone present in the courtroom understood that on appeal Busse would be challenging the state's jurisdiction to enforce licensure laws on a reservation through a driving after cancellation charge. As such, I cannot agree that Busse waived a challenge to the state's authority to require him to have a license when operating a motor vehicle.[2]

---

**2.** Contrary to the majority's characterization,

I do not here suggest that use of a *Lothenbach*

State statutes requiring a driver's license to operate any motor vehicle on the streets and highways within the state do not apply to tribal members on the reservation. *Stone*, 572 N.W.2d at 731. Such licensure decisions fit squarely in the civil/regulatory arena. Because the state cannot prove that operation of the motor vehicle involved in this offense required a driver's license, the state cannot prove an essential element of the offense and the charge must be dismissed.

Therefore, I respectfully dissent.

PAGE, Justice (dissenting).

I join in the dissent of Justice Anderson, Russell A.

STRINGER, Justice (dissenting).

I join in the dissent of Justice Anderson, Russell A.

PAGE, Justice (dissenting).

I respectfully dissent. Although I join in the dissents of Justice Russell Anderson and Justice Stringer, I write separately to highlight certain flaws in the court's reasoning. Stated simply, if the court was right in both *State v. Stone*, 572 N.W.2d 725 (Minn.1997), and *State v. Johnson*, 598 N.W.2d at 684 (Minn.1999), the court is wrong now. In *Johnson*, we stated:

> We would hardly be consistent to now conclude that even though a tribal member is not required to have a driver's license at all while driving on a tribal reservation, driving after revocation of a license should be an offense that rises to

the level of a "heightened public policy" concern.

*Johnson*, 598 N.W.2d at 684. We would be no more consistent to conclude here that driving after cancellation as inimical to public safety presents a heightened public policy concern given that, like driving after revocation, it is a subsequent violation committed only after a driver's license has been canceled because of a prior offense. Yet, that is exactly what the court concludes in this case. The conduct ultimately at issue in *Stone* and *Johnson* that is relevant to this case is driving. The conduct at issue here is driving. While the issue in each of the three cases is driving, the subtext for the present case is drinking and driving.

In *Stone*, we held that driving without a driver's license in violation of Minn.Stat. § 171.02 (1996) was a civil/regulatory offense, which the state lacked jurisdiction to enforce against members of an Indian tribe driving on tribal land. *Stone*, 572 N.W.2d at 731. Thus, under *Stone*, a tribal member driving on tribal land cannot be required to have a valid Minnesota driver's license. In *Johnson*, we held that driving after revocation of a person's driver's license in violation of Minn.Stat. § 171.24, subd. 2 (1998), was a civil/regulatory offense, which the state lacked jurisdiction to enforce against tribal members driving on tribal land. *Johnson*, 598 N.W.2d at 684. If we apply the logic of *Stone* and *Johnson* to the facts presented here and do not improperly look to the underlying offense

---

procedure is appropriate to challenge whether the state has proved the elements of the offense. As the majority acknowledges, this court has not decided that issue, although the majority proceeds to do so by stating that Busse was required to proceed to trial to challenge whether the state proved its case. I note only that the similarity in this case between the pretrial issue sought to be appealed

(whether the state can enforce driving after cancellation on a reservation) is sufficiently close to the element of the offense challenged as unproven (whether operation of a motor vehicle (on reservation) required a driver's license) that a finding of waiver is particularly harsh. I would leave for another day the scope of a stipulation to the state's case in a *Lothenbach* plea.

to determine the level of public policy concern, only one conclusion can be reached: the state lacks jurisdiction to enforce its driving after cancellation as inimical to public safety statute, Minn.Stat. § 171.24, subd. 5, against tribal members driving on tribal land.

Because the proscribed conduct here is the same as in *Stone* and *Johnson*, the court's conclusion that the offense here is criminal/prohibitory rather than civil/regulatory is logically inconsistent with our holding in both *Stone* and *Johnson*. If the state cannot enforce its prohibition against driving without a license or its prohibition against driving after revocation against a tribal member driving on tribal land, what possible basis is there for enforcing its prohibition against driving after cancellation as inimical to public safety? [1]

The court concludes that, because of heightened public policy concerns associated with Minn.Stat. § 171.24, subd. 5, the statute is criminal/prohibitory and, therefore, enforceable by the state against tribal members driving on tribal land. Yet, the real focus of the court's attention is the conduct of drinking and driving, conduct that is clearly criminal/prohibitory and which the state has jurisdiction to enforce against members of an Indian tribe driving on tribal lands. While the court spends a great deal of time justifying its conclusion that driving alone creates heightened public policy concerns, what it is actually doing is using the term "driving" as a substitute for "drinking and driving." In this case, the fact that Busse is likely to continue to drive after drinking is what makes his conduct inimical to public safety. There is nothing in the record, however, to suggest that Busse's driving alone makes him more injurious or harmful than any other driver. Although emotionally appealing, the court may not conclude that driving after cancellation as inimical to public safety involves heightened public policy concerns by looking to the nature of Busse's prior offense. *Johnson*, 598 N.W.2d at 684.

Without impermissibly looking to the nature of the prior offense to measure the nature of the subsequent offense, *Johnson*, 598 N.W.2d at 684, there is no logical basis for treating people whose licenses have been suspended or revoked for driving under the influence any different than people whose driver's licenses have been canceled as inimical to public safety. The underlying concern in each instance is to stop the individual from driving under the influence. The only difference between the three is that each driving-under-the-influence offense conviction results in a harsher sanction. Presumably, the increasingly harsher sanctions are intended to be a progressively stronger disincentive to drive under the influence. First comes

---

**1.** One effect of the court's decision is to create separate classifications for similarly situated people engaging in the conduct of driving, none of whom the State of Minnesota can require to have driver's licenses. One class is made up of people who have never had driver's licenses and who therefore cannot be prosecuted under the driving after cancellation as inimical to public safety statute. The second class of people, while also not required to have driver's licenses, happen to have licenses that have been canceled as inimical to public safety and, thus, can be prosecuted under the statute. By virtue of never having had a license, the first class is protected from prosecution under the statute, while the second class is not.

The court points out that the state may deny licenses even to those who do not have them. That observation may well be correct, as far as it goes. In making that observation, however, an important point is missed. There is a distinction to be made, on the one hand, between those who either do not have a license or are not eligible to obtain a license, and those who, on the other hand, do not need a driver's license in the first instance.

suspension,[2] next comes revocation,[3] and, finally, comes cancellation as inimical to public safety.[4] But it is the driving under the influence that triggers the withdrawal of the offender's driver's license for increasingly longer periods of time; it is not driving alone.

To the extent that in *Johnson* we held that the state had no jurisdiction to enforce the driving-after-revocation statute against tribal members driving on tribal lands, driving after cancellation as inimical to public safety should produce no different result. Suspension, revocation, and cancellation of one's driver's license are all, among other things, intended to discourage people from driving under the influence. If driving after revocation, without regard to the underlying offense, did not trigger a heightened public policy concern in *Johnson*, driving after cancellation as inimical to public safety should not do so here.

In addition, the court erroneously presumes that the only people the state can charge with driving after cancellation as inimical to public safety are people, like Busse, who have multiple driving-under-the-influence convictions. This is a misunderstanding of the law and, thus, does not support the court's conclusion that driving as inimical to public safety creates a heightened public policy concern. While it is true that the commissioner must cancel a person's driver's license as inimical to public safety after the person has been convicted of driving under the influence three times within the past five years,[5] the commissioner may also cancel a driver's license as inimical to public safety for reasons unrelated to driving under the influence. Minn.Stat. § 171.04, subd. 1(10). Therefore, like suspension and revocation, cancellation as inimical to public safety does not present the same public policy concern as do penalties related solely to driving under the influence.

The preceding discussion notwithstanding, one final point needs to be made: Minnesota Statutes § 171.24, subdivision 5, by its express terms is not applicable to the facts presented in this case. The statute applies only in instances when the operation of a motor vehicle requires a

**2.** "Suspension" is the commissioner's temporary withdrawal of a person's driver's license and privilege to drive in this state under Minn.Stat. §§ 169.121, subd. 8, or 171.18. Minn. R. 7503.0100, subp. 12. A period of suspension may last up to one year. Minn. R. 7503.0300. Driving after suspension is a misdemeanor. Minn.Stat. § 171.24, subd. 1.

**3.** "Revocation" is the commissioner's withdrawal of a person's driver's license and privilege to drive in this state for a specific minimum period under Minn.Stat. §§ 169.121, 169.123, or 171.17. Minn. R. 7503.0100, subp. 9. A period of revocation may last from 30 days to 5 years, depending on the driving record of the person involved and the underlying offense. *See* Minn.Stat. §§ 169A.54, subds. 1–5, 171.17; Minn. R. 7503.0800, subp. 2. Driving after revocation is a misdemeanor. Minn.Stat. § 171.24, subd. 2.

**4.** "Cancellation and denial" is the commissioner's withdrawal of a person's driver's license and privilege to drive in Minnesota pursuant to Minn.Stat. §§ 171.04, subd. 1(6), (10), (11), or (12), 171.13, subd. 4, or 171.14. Minn. R. 7503.0100, subp. 4. Cancellation as inimical to public safety, *see* Minn.Stat. § 171.04(10), is presumably indefinite, although reinstatement after cancellation is possible. *See* Minn. R. 7503.1600. Driving after cancellation is a misdemeanor and driving after cancellation as inimical to public safety is a gross misdemeanor. Minn.Stat. § 171.24, subds. 3, 5.

**5.** Cancellation as inimical to public safety is also mandatory when a person has incurred three alcohol-related incidents and a special review has been conducted within 10 years of the third incident or when a person has four or more alcohol- or controlled-substance-re-

driver's license.[6] Because Busse was a member of an Indian tribe driving on tribal land at the time of the offense, no driver's license was "required" to operate the motor vehicle. *Stone* 572 N.W.2d at 731. Thus, Busse's lack of a driver's license did not result in a violation of Minn. Stat. § 171.24, subd. 5.

Although cleverly disguised, the court's objective is transparent. With this decision, the court has accomplished what the dissents in *Stone* and *Johnson* could not. I would affirm the court of appeals in holding that Minn.Stat. §§ 171.24, subd. 5, and 171.04, subd. 1(10), are civil/regulatory offenses and, therefore, not within the state's jurisdiction to enforce against members of an Indian tribe driving on tribal land.

STRINGER, Justice (dissenting).

I join in the dissent of Justice Page.

ANDERSON, Russell A. (dissenting).

I join in the dissent of Justice Page.

STRINGER, Justice (dissenting).

I join with Justice Russell Anderson and Justice Page in dissent, but I write separately to emphasize my concern for the departure the majority opinion represents from the clear legal principles established by this court so recently in *State v. Stone,* 572 N.W.2d 725 (Minn.1997) and *State v.*

*Johnson,* 598 N.W.2d 680 (Minn.1999). In a nutshell, for two principle reasons the analysis of the majority simply does not support its conclusion.

First, the majority reviews at length Busse's DWI violations in an apparent effort to characterize him as a public threat because of his propensity for driving while intoxicated. But he has paid his price for those offenses, and while tantalizing to snare the unwary[1] into believing that he once again is before the court for this predilection, he is not. The sole charge against him before the court now is driving after cancellation of his license as inimical to public safety. The reason the majority would prefer to focus on driving while drinking charges however, seems quite obvious. The majority claims that in *Johnson* we did not intend to preclude looking at the substantive aspects of a prior offense to determine whether it raises heightened public policy concerns as to the offense currently before the court, and that our language in *Johnson* was "decidedly tentative" in that respect. I disagree. Our ruling in *Johnson* was clear and unequivocal—we held that because the prior offense carries its own sanction, fairness dictates it not again be used to determine the sanction for the current-and substantially different—matter before the court, *Johnson,* 598 N.W.2d at 684. Our language in *Johnson* was a warning that the very step the majority is now taking

---

lated incidents on record. Minn. R. 7503.1300.

6. Minn.Stat. § 171.24, subd. 5, states:

A person is guilty of a gross misdemeanor if:

(1) the person's driver's license or driving privilege has been canceled or denied under section 171.04, subdivision 1, clause (10);

(2) the person has been given notice of or reasonably should know of the cancellation or denial; and

(3) the person disobeys the order by operating in this state any motor vehicle, *the*

*operation of which requires a driver's license,* while the person's license or privilege is canceled or denied.
(Emphasis added.)

1. The majority apparently takes some umbrage for language in this dissent, characterizing it as "dramatic." So be it. When respected colleagues stray so far from established jurisprudence, as does the majority, drama is the appropriate antidote to catch their conscience. "The play's the thing Wherein I'll catch the conscience of the king." William Shakespeare, *Hamlet,* act 2, sc. 2.

could—and in the majority ruling now does—lead to sanctioning Busse for a second time for his driving while drinking offenses. The majority's analysis is particularly perverse when it relies on *Stone:* "[W]e follow *Stone's* direction to also consider the extent to which the activity directly threatens physical harm." If it followed *Stone's* direction however, it would come to just the opposite conclusion, because the "activity" here was driving after cancellation-conduct that hardly threatens physical harm. It is noteworthy that the arresting officer apparently did not think so either, as he did not arrest Busse at the time he observed him driving, but rather hours later when Busse was sitting benignly as a passenger in a car driven by a friend. There is no evidence of alcohol involvement on either occasion.

Second, the majority fails to answer the point we made in *State v. Johnson* and repeated in the dissents in which I join: if, as we held in *State v. Stone,* a tribal member is not subject to state traffic laws requiring a driver's license while driving on his reservation, under what possible reasoning can that tribal member be subject to state traffic laws for driving after cancellation of his unneeded license? I assert that if this question cannot be answered, and from the failure of the majority to answer it, it appears that it cannot, then the fundamental principle of the majority's logic fails, because the "crime" as to which he is charged is not a crime at all.

PAGE, Justice (dissenting).

I join in the dissent of Justice Stringer.

ANDERSON, Russell A., Justice (dissenting).

I join in the dissent of Justice Stringer.